calendar. It is Cornell v. Montgomery, 24-1304. Okay, looks like he's ready. Good morning, Your Honors. May it please the Court, my name is Stephanie Adractis and I represent the petitioner, Quate Cornell. Cornell's convictions should be vacated because his trial counsel was prejudicially ineffective in litigating the motion to suppress evidence that was unlawfully seized under the Fourth Amendment. Trial counsel admitted in his post-trial declaration that his representation was professionally unreasonable. First, counsel unreasonably conceded that a handgun magazine inside a parked car, a car that Cornell shared with his mother, was properly seized because it was in plain view. However, an object can only be seized under the plain view exception to the warrant requirement if the officer is lawfully observing the object in the first place and searching that area, and if the item itself is inherently incriminating. Counsel, the government's found no prejudice given the totality of the circumstances under which the officers were responding to the 9-1-1 call. The Court of Appeal opinion is different, it sounds like Your Honors referring to that last recent decision, which is somewhat different from the decision of the trial court on this. Both of them, however, found that the plain view exception essentially didn't matter because they thought that this was a reasonable search of the interior of the car as a teary pat-down, which is somewhat common. If the court examines carefully the Court of Appeal opinion on that point, the Court of Appeal opinion says that under these circumstances where the police officer arrives and he saw another person, Sloan, trying to get away, the officer then pointed his gun at Sloan, Sloan dropped a gun on the ground, and the Court of Appeal said, well, under those circumstances we think it was reasonable to pat-search the people that were present. He saw the woman kind of scrunching down in the car to avoid being seen by the officer, and this is all occurring within what, a couple of hours of three people being shot in the city not far away. Why doesn't all that enter into the reasonableness of the officer's fear for his safety? There's two issues. One is Kirk's behavior. The court just referred to him as Kirk's crouching. And the second being the homicides. This incident had nothing to do with the homicides. Is there anything in the record that tells us that this responding officer knew about the homicides the judge was referring to? There is nothing in the record that says that all they had was an anonymous call that people were congregating at this party and possibly with weapons. That was the only information. I don't think it is. Can we go through this? Because I think this is really important, and I think that's what we're all getting at. So the officer has this 9-11 call, and these folks are congregating, and they might have weapons, right? Very unspecific, but they did mention they may have weapons, right? Yes. The officer got there. This is Officer Olvera, and he said he saw a person looking up and down the street, right, acting as a lookout. And I was trying to figure out if they made eye contact. I think Officer Olvera testified or said, I believe he observed me. And Officer Olvera is in uniform, right? Apparently in a marked car, as far as I can tell. Not everybody's in that person. And they react. That's the third thing. I think they react. The folks react to him, and then I think he sees, maybe it's in that order, then he sees Sloan toss something into the bush that turns out to be a weapon, right? But I don't know that we know it was a weapon yet, but it certainly was a suspicious activity. Maybe weapons, maybe drugs, but certainly a suspicious action, it seems. And then he sees the woman's punching down. I think all those things had happened before the plain view of the magazine. But please correct me if I'm wrong. So the officer said that he saw what he claimed was a person, quote, acting as a lookout, and we would challenge that characterization because acting as a lookout, there's no basis for the essentially claim that you're reading this person's mind, that there was a person standing on the street, not in the same area. He testified that he had to continue driving in order to reach the area where these people were. He's approaching a group, a large group of people. At this point, he's all by himself. And your argument is that he couldn't make a common-sense observation that this guy was acting like a lookout, particularly where everybody scatters as soon as they see the police car. But they did not scatter when they saw the police car. What the officer said was, I saw the man. I continued driving. We don't even know how closely connected this man was to the group. Before you go on to continue driving, did an officer out there describe the man looking up and down the street? For me, that was important. Yes, he described a man looking up and down the street. That's an innocuous behavior. Well, an officer out there doesn't have to be right. He has to be, I'm just trying to figure out if he had a reason to be concerned because he's, after all, responding to a 9-11 concern. Yes, so he described that as acting as a lookout. But that was his assumption, but there was absolutely no corroboration. That was just what he assumed was happening. Okay, and the report is a disturbance with fire. There was no report. It wasn't a disturbance. They said there was a group of people. This was a birthday party. It was a group of people standing outside at a birthday party. There wasn't any report of a disturbance. Was it a concern in that 9-11 call that there may have been weapons? They said possibly weapons. No one said that they actually did see a weapon. Got it. Okay, so I interrupted you, and I want to make sure about what he knew or what he thought. And you said that he, I think we agree, that Officer Alvara sees this person, I think later identified as Sloan, looking up and down the street. He interprets that as acting as a lookout. But you started to say he kept driving, and I want to make sure I understand the importance of that. He said that he kept driving, and it was not clear at all that this person who was supposedly acting as a lookout, what their connection was to the scene. And actually, I don't believe it could have been Sloan because Sloan was at the party. When the officer pulls up, he's at the party. They're all at the party. They're all just standing there. They don't scatter. They're at a birthday party, and they're standing outside. Is the street as the party or on the opposite side of the street? My understanding is they're standing on the street, and the party is across the street. I think so, too, on the opposite side of the street. Yes. Okay, so he drove past him. He pulls up, and the suspicious thing that he sees is Sloan. Sloan is the person who ultimately testified for the prosecution at trial. Sloan tries to crouch, and then Officer Olvera drew his weapon, and then Sloan ditched a gun that he was holding onto the ground. And then he's the one who is behaving suspiciously. Clearly, he is suspicious, him alone. So is your argument from a habeas standpoint that the California courts made an unreasonable determination of the facts based on the evidence? Both, Your Honor. The Court of Appeal unreasonably determined and applied Michigan v. Long, and it also unreasonably- My question is in regards to the evidence that there was an unreasonable determination of the fact. There were several unreasonable determinations of the fact. One beginning with they said that Sloan had ditched his gun underneath my client's mother's Nissan. That didn't happen. There was no testimony to that point. It was somehow connecting my client's- He put it on the ground, but it was the only information that could have possibly connected my client's car to what Sloan was doing, but it just wasn't true. There was no testimony that that's what happened. Well- There are other problems, factually. The ones that matter? Yes. Okay. Yes, Your Honor. The Court of Appeal said, well, you know, they found multiple guns, and so they had a good justification for searching the interior of the car, even without consent or other rationales, but there was no testimony as to finding the second gun. The second gun, we don't even know, based on the record, when that was discovered. It was discovered in the other car. How that was discovered in the other car is your point that it was temporal. If you don't know that, it happened already. Right. Because the reasonableness of the search of my client's car has to be evaluated based on what the officer knew when he searched the car. I know. That's why we're doing this exercise. Sophia, just take a breath and slow down a little bit, because this is important, and I want to make sure we got it. And I think your point about in response to Judge Tomlin's question, right, is that as of the time of this plain view, that's what we're looking at, you think that the California last recent decision may be wrong factually because there isn't anything in the record to show that the other gun in the other car had already been found. Is that it? That's one factor. Let's take a guess if we've got that.  Okay. That's one. All right. And the next factor is what? The other factors are that attributing Sloan's suspicious behavior to every person on the scene was objectively unreasonable. There was one person who was. That's not a finding of fact. This is your D1 argument about Terry, I think. Right. Because the top of your decision tree is the domino. The top of your, to mix a metaphor. But anyway, the top of the decision tree really has to be the detention of your client. And so I'm trying to figure out why you think it was unreasonable for the California court to decide that the officer had what he needed to detain your client. So when the court of appeals said it was reasonable for the officer to detain and pat down Mr. Cornell, his physical body outside the car, that's a reasonable decision. Right? When he's standing outside the car, they see another person with a gun. They're saying they're patting his body down as he's standing outside the car. The officer is concerned about his own safety. They find nothing. He doesn't have anything on his person. The real question which they skipped, they skipped in the decision, was was it justified for them to order Ms. Kirk to get out of the car? It was not the pat down. You're good with that. And it's not the pat down. It's not the pat down of his body. Okay, wait a minute. And the officer also said, wait a minute, don't walk away. You're okay with that. The pat down of his body was objective. That's a yes or no because the officer did a couple of things. One was I think he stopped your client from walking away, and I don't hear you objecting to that. Then there's the pat down, and you think that was okay. You should stop me if I'm wrong. Your Honor, the detention of Mr. Cornell, we do dispute whether his extended detention was justified under these circumstances. The point I was trying to make was when the court of appeals said that it was a reasonable decision on the part of the officer to pat people down on the scene when he got there, that doesn't excuse the entry into Mr. Cornell's car and the search of the interior. And that's later in the sequence of events. If you're making the same argument that was made to the District Court of Appeal and reject it, you're trying to divide and conquer. And we look at the totality of the circumstances in the court of appeals. I'm looking at Appellant's Excerpt of Record 55. This is California Court of Appeals. We conclude the record provides ample support for the trial judge's determination that the warrantless search of the center console compartment of Cornell's car did not violate the Fourth Amendment. And then they go on to say, the argument that you're making misses the point. The focus is on the totality of the circumstances, not on each individual circumstance as if it stood in isolation. And here, when we consider all of the circumstances known to Detective Olvera, when he saw the magazine in Cornell's car, we have no trouble concluding his actions were reasonable under the Fourth Amendment. He and his fellow officers had come upon a large group of people at night. They knew at least one person had been armed with a gun, and another person had a gun inside their car. The possibility that they had not yet discovered all of the weapons present and the risk one could be used against them cannot be overstated. And your argument is that's an unreasonable determination of both the facts and application of Fourth Amendment law. But you've answered, right? You said you don't know that there's evidence that they had already found the other gun. Yeah, I get that. We understand that. But... The problem with the analysis is that trial counsel never actually litigated the Terry issue, right? When they're arguing about plain view, in this case, what they're trying to say is, what was argued below and I argued here, is that trial counsel's assessment that this item was in plain view is just flatly wrong. And so... You mean factually or do you mean legally wrong? It was legally wrong that it could have been properly seized under the plain view exception because the officer wasn't legally looking around inside the car. He couldn't legally intrude inside the car. Well, he asked her to step out. She's scrunching down that suspicious behavior, and it was about, we haven't mentioned this yet, it was 2 or 3 in the morning, and there was a concern about this group and maybe weapons. So he asked her, and you've already, at this point, already seen Sloan toss something, it turns out, a gun. So whether the other gun in the other car was found or not, what's wrong with asking her to step out of the car? It was about 9.30 p.m. Really? When the arrest at the roadside, or the stop at the roadside, it was about 9.30, is my understanding. I thought 9... Okay, then I'm mistaken, so it's evening. At this time of year, was it dark? I'm sure it was probably dark by that time. So that's helpful, but I appreciate the correction, but go on. If you could, I want to make sure I understand why you think it was impermissible under those circumstances for the officer to ask her to step out of the car. Under Pennsylvania v. Men's, an officer can ask a person to step outside the vehicle if there is a reasonable suspicion, individualized, as to that person and the vehicle, that there has been a crime committed. And here, the car is legally parked on the roadside. Ms. Kirk hadn't committed any crime. It's an officer's safety, isn't it? But the bill does not hold that a person can be asked to step out of the car solely for officer safety reasons. It says that there has to be... You had the person's long coat in order to discover the sawed-off shotgun that was slung from his shoulder. I'm sorry, I... Terry. But that's a completely different set of facts. It didn't involve a car, and that's why MIMS is so important to this analysis, is because MIMS discusses when can an officer make a person get out of a car. And making Ms. Kirk get out of the car was absolutely crucial in this situation because the officer himself testified that by making her get out and opening the door, leaving the door open, that's what gave him the opportunity to peer inside and see what was inside the car. It gave him the opportunity to search it. I appreciate that and understand the sequence, but it seems to me that even after the 911 call, concerned about weapons and Sloan, you know, gittering or tossing or scooting the gun, both of those events had happened prior to him asking the officer, asking Ms. Kirk to get out of the car. And she was, you know, behaving suspiciously, right? She slunched or scrunching down, trying to hide is the way he described it, and that's her position that he didn't. It was unreasonable for the California court to decide that it was permissible for him to ask her to step out of the car. Yes, because under MIMS, there had to have been an individualized suspicion, and that lack of individualized suspicion is a problem throughout this entire scenario. We have a large group of people. This is a birthday party. You cannot, under a clearly established authority, attribute the actions of one person that are arguably suspicious to every single person in the area. I don't remember the date, but we have a decision, Mobile Cava versus the City of Los Angeles, that says that it's discretionary with the officers, whether they order people inside a car to get out or to stay in the car, depending on officer safety concerns. Why does that not apply here? We don't argue with that. What we argue with is that Ms. Kirk had done anything that was suggested, that she was committing a crime, and that's what MIMS requires. But it doesn't matter if all the other circumstances point to the fact that there may be weapons present that could be used against the officers while they're trying to figure out what's going on here. Your Honor, there isn't a case that says that only under Terry, which Terry even itself requires reasonable individualized suspicion, not suspicion that in that area there might be something threatening. It requires a reasonable individualized suspicion as to that particular person in place. That's what's missing here. That's what's absent here. There isn't anything that suggests that Ms. Kirk was committing a crime, that she herself was doing anything that was suggested. I think her hiding is enough. If that's what you're really telling us, then I want to make sure I understand your argument. Your Honor, I would dispute the idea that a person could hide in the position that she was in. If she's sitting in an Altima sedan, she's in the front passenger seat, how in the world could anyone hide? It's sort of a delighting act to say that you could hide. I don't know how big she is. We don't know that. From what we know, she's an adult. And it just doesn't make sense that a person could hide. Counsel, I'm going to stop you because you're three and a half minutes. I'm sorry. Well, no, we've taken you over. Please plan on two minutes when you come back with one more time on the clock. Thank you for your patience with the homework questions. And by the way, you're right. It was 930. I know you knew that. And I appreciate the correction. Okay. Good morning, and may it please the Court, Vincent LaPietra on behalf of Respondent. The State Court recently applied Strickland in rejecting this claim. It's important to remember that this is an ineffective assistance of counsel claim, not a Fourth Amendment claim. And as the United States Supreme Court recognized in Killiman, even a good Fourth Amendment claim is insufficient to obtain federal habeas relief. It depends on how good it is and whether counsel missed it. And so we fully appreciate the layers of review here, and we are reminded of that frequently. But can you go to the Patterson case, please, and tell me why you think defense counsel was reasonable in not arguing Patterson? It's a Sixth Circuit case, and the fact pattern, it's an out-of-circuit authority, no question. The fact pattern is strikingly similar. Well, if I may finish my first point, Your Honor, which is that much of counsel's argument is that the record fails to establish how far the officer drove, where the people were in relation to others, and what was going on. And that is a failing of petitioners in pleading prejudice for a Strickland claim. None of that was litigated, and indeed in the California Court of Appeal, beginning at the beginning of the decision tree, the initial detention, they said counsel didn't object, and that is forfeited. So the discussion about whether or not there was a proper initial detention was forfeited, barred by stone, and here, even if we throw out the California Court of Appeal opinion, I would note that the declaration from counsel doesn't touch on his decision to not challenge the initial detention at all. So the absence of evidence can't overcome the presumption of competence. In this case, it seems clear that he believed his best argument was to challenge the search of the vehicle where the gun was found. So let's say that I agree with everything the government has to say up until the plain view that the law officer was lawfully positioned and saw the magazine, right, asked her to step out and saw the magazine. Then from that point on, can you explain the justification for the search of the vehicle? Well, I must admit that I overlooked something, and I would like to bring the Court's attention to the excerpts of Record Act 234, which was the suppression motion hearing where the officer says, if I was standing outside the door through the window, it would be a plain view. He was referring to the handgun magazine. So he was specifically asked, even if he didn't open the door and asked the woman to get out of the car, could you have seen the handgun magazine? And he said, yes, I could have. But I'm going with my hypotheticals. Let's just say that I agree with everything, including that he had cause to ask her to step out, because after all, he says she was trying to hide in the front seat, maybe laying back, maybe scrunching down, I don't know, but trying to hide. So at that point, then the question becomes, there's nobody in the car anymore, right? It was empty. And so what's the justification for searching the rest of the car? Well, first of all, I would note, again, that it's not clear that he would have standing to assert a Fourth Amendment right on her behalf, challenging her exiting of the vehicle. I'm not questioning her exiting. Right. So the question was, once she's out of the vehicle, why was the officer justified in searching the vehicle? I'm sorry. Up until seizing the magazine, right? Up until seizing the magazine. And the concern is officer safety. Yes. So I think your argument is that there's concern that there are other weapons in the vehicle. Yes. Okay. But nobody's in the vehicle. Yes. At that point. And so nobody can reach anything in the vehicle. And so what was your theory? What was the state's theory about why the rest of that search was permissible? Because the officer needed to, at some point, release people. In order to release people back into the car, then he needed to make sure that it was safe. There was already a handgun found inside of the Impala, and there was a handgun found on the ground, and there was a handgun magazine sitting in the cup holder. Not to belabor the point. Opposing counsel thinks there isn't anything in the record to show that the gun in the other car had already been located. Is there? I believe the officer testified that I searched the Impala and found the handgun, and then I turned my attention to the red Nissan. Do you have an ER side? Opposing counsel, you heard her take issue with that. She thinks that's not in the record. I believe it's similar, right around 233. Okay. Good check. Thank you. And, again, Your Honor, I'm sorry. I know I didn't answer the court's question. I'm looking for this search record. Patterson. Yes, page 48. But, again, before we get to any of this, we have to decide if the California Court of Appeal decision was reasonable or not. And the argument was that counsel incorrectly believed that possession of overcapacity handgun magazine was illegal and shouldn't have conceded plain view. We know that that didn't result in any sort of prejudice. Number one, the officer said I could see the handgun through the window. Number two, the plain view doctrine and confiscating the handgun is not an issue. It's just the mere presence of the handgun magazine as one of the circumstances under the totality. And for that reason, the officer was justified in searching the vehicle because it was clear. It seemed clear to him that there was another weapon inside the vehicle. And the Patterson case is distinguishable because counsel is trying to tie Cornell to the vehicle, right? This individualized suspicion. She's trying to say there was no individualized suspicion of Mr. Cornell, so you couldn't search the vehicle. But that's not at all the standard because there was individualized suspicion of the vehicle itself. It doesn't matter that Cornell was over there. There was somebody in the vehicle who was attempting to hide. And there's nothing to say, oh, you have to find the owner of the vehicle in order to determine whether or not they're suspicious. The person in the vehicle can be suspicious, such as somebody trying to hide. And it was individualized suspicion of the vehicle itself. Somebody trying to hide a handgun magazine. I think you consistently argued, the state consistently argued, officer safety was a concern. Yes. No warrant. Concerned about officers. Yes, I believe I stipulated that this was a concern. Right. So I'm trying to figure out what was a concern about officer safety after she's out of the car. Nobody's in the car. The suspicion was that there was a gun in the car. Yes, there was a gun in the car. It would have been, as I said in the brief, it would have been unreasonable to release this group of people back into the car without having checked it. And turn around and walk back to the patrol car and get in. That's our position. Thank you. I've lost my train of thought. I have two questions. I have two questions. Your response. But just to summarize, again, this is Strickland's claim. He didn't speak at all in his declaration about why he didn't challenge the initial detention. It seems clear that he thought it was better to challenge the search of the vehicle. When it comes to the search of the vehicle, his mistaken belief that overcapacity handgun magazine was illegal doesn't matter because it doesn't change the calculus of the totality of circumstances. It was, as the California Court of Appeal directly cited the United States Supreme Court President, even a lawfully possessed weapon can justify a search. And in this case, it was an officer safety search. And to the court's point, it would have been unreasonable to release this group of people, not all of whom were arrested, back into these vehicles without having checked them for weapons. That wasn't my point. That was your point. That's my point. That's your argument. I understand. Thank you. Unless there are any questions. I don't know. I don't have anything else. No, thank you. Thank you. Thank you. I would like to address counsel's statement that there was individualized suspicion of the vehicle itself because given that this was a birthday party, a large group of people, there was no evidence of the connection between the individuals at the scene and the one person who was behaving suspiciously, that being Sloan, other than the fact that they were all attending the same birthday party. And the Supreme Court has emphasized that the suspicion has to be individualized. And if one could say that any vehicle that was parked there could be subject to search because there was one person outside the cars acting suspiciously, that would violate that clearly established rule. Your argument ignores the fact that the original dispatch was that there were several individuals and there were guns present. And the officer arrives. We have all this testimony about the people dispersing and the lookout and so on. The lookout drops a gun. So we got one gun there. And then there's another gun found in the Impala. And now he sees a magazine in the Nissan. And the question is, you know, doesn't the officer have a right to make sure that he can prevent himself from attack while he conducts a preliminary investigation to determine what all these people are doing? Any time there's a large group of people, an officer could say, well, I'm concerned about my safety. I'm going to just search every single one of these cars and pat down all these people. There was no apparent connection between any of them other than that they were all at the same party. They're across the street from the party. This group was not just part of the party, right? It was a setting standing separately. And there had been the 911 call. And then he sees the person he thinks is looking up and down the street. And then he sees the gun being tossed. So why isn't that enough? Because we don't even know. The tip that they got, the anonymous call, didn't even say that there were weapons. It said, we think there's possibly weapons. So that was inherently vague. Also, there was nothing connecting Mr. Cornell's car to Mr. Sloan's suspicious behavior. And I will concede Mr. Sloan's behavior was suspicious. The state's prosecution witness, he did things that were inherently suspicious. That would justify a search of him, a search of his vehicle, arguably, those kinds of things. But Florida v. Royer says it's not suspicious to avoid the police. It's not suspicious to start walking away when police arrive. And that normal people will do that for perfectly legal, valid reasons. So this idea that because the people, all of them that were standing around there, started to walk away, that meant that you could search Mr. Cornell's car, doesn't hold water. You're over time. So can I ask you, please, before you leave, do you want to address Patterson? Your Honor, I think the court is correct that it is. Is it your strongest case? It was the strongest one that I could find that aligned with the issues. Facts are strikingly similar. It's out of circuit authority. It's not binding. Of course, you know that. What's the closest in-circuit authority that mirrors Patterson? Is there any? Your Honor, I couldn't find one as close as Patterson in circuit. So that's why I cited it, understanding that the court is not bound by that case. What's your best in-circuit authority? Your Honor, I couldn't find a Ninth Circuit case that is substantially similar. That's because there's sort of this unique positioning of Plainview and Terry in one analysis here. And that complicates the analysis partly, I would submit, because the State Court of Appeal confused the two when it was issuing its ruling. Instead of addressing Plainview head-on, it simply moved over to Terry and said, well, it doesn't matter that counsel was wrong essentially and pliably, that he was wrong about that because Terry rescues us. That's why it's okay for the police to have done what they did. That's why you think counsel was IAC for not challenging the Plainview? Yes. Is that it? Yes. Well, for making that concession because he was wrong to begin with, but then he also didn't litigate the suppression issue really at all on its merits. He never made the Terry argument. He never talked about whether or not the officer had a legal reason to be peering into the car and whether or not that was appropriate and based on individualized suspicion, which is what should have been argued. Was it permissible to look in the car and to take the magazine out? Was there reason to search the rest of the car at that point? No, Your Honor, and that's the second element of Michigan v. Long. There was never any basis even argued that there was anybody at that point who had access to a weapon. And if this argument that, well, we have to let them drive away, if that's really the reason, then you can always search the car. Then the second element of Long doesn't even have any meaning. And it should. It's in the test, the Supreme Court's test, that the person has to be able to reach a weapon at the time, and there wasn't any evidence of that, that anyone could possibly have heard the police. You couldn't remove the person before you conduct the search. I mean, the Supreme Court has never said that it has to be done while the person is still sitting in the car. They didn't say that in Long. The person had been, I believe, already removed in Long before they did the search. But in this case, as the court has pointed out, why not get a warrant? There wasn't any evidence that the police, once everyone was outside the vehicle, and they must have patted down Ms. Kirk and noticed that she didn't have a weapon and Mr. Cornell didn't either. Do you concede there was probable cause to believe that the car contained a weapon in order to get a warrant? They would have had to have established that. Well, no, the question is do you concede there was probable cause? No. Thank you, Debra, so much. We are way over your time, but I really appreciate your patience, both of you. We have all of our questions. We'll take that under advisement and stand in recess. All rise.
judges: TALLMAN, CLIFTON, CHRISTEN